# H. R. BRUNING v. STATE.

No. A-9243.   Oct. 8, 1937.
(72 P. 2d 393.)

Owen F. Renegar, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for the State.

DOYLE, J.   Upon an information against H. R. Bruning, Rosa E. Bell, Albert Zirm, and others, charging them with the crime of forgery, the defendant H. R. Bruning asked for and was granted a severance.  Upon his trial the jury returned their verdict finding him guilty of forgery in the second degree, leaving the punishment to the court.   The court overruled the motion for a new trial on June 26, 1936, and rendered judgment and sentenced defendant to serve a term of three years in the state penitentiary.   From the judgment of conviction he appeals.

The information charged that in Oklahoma county on the 25th day of April, 1936, the said defendants, then and there being, while acting conjointly and together, did then and there knowingly, fraudulently, unlawfully, and feloniously, with intent to defraud, utter and publish as true a certain instrument in writing, to wit, one mineral deed.   The alleged forged instrument or deed is set forth in extenso, and the acknowledgment thereon.   The instrument purported to be a mineral deed, executed by John B. Straw and Mable Meredith Straw, husband and wife, to lots 11, 12, 13, and 14, in block 1, Hare's Lincoln Boulevard addition to Oklahoma City, consideration named, $1 cash and other good and valuable considerations.   It bears the date of the 25th day of April, 1936, and acknowledged before Albert Zirm, a notary public in and for Oklahoma county, and purports to grant, bargain, sell, and convey, transfer, and deliver unto D. B. Ellis, of Oklahoma City, an undivided whole interest in and to all the oil, gas, and other minerals in and under that may

be produced from the aforesaid land; that at the time said defendants so uttered the false instrument as genuine said defendants well knew that said names "John B. Straw and Mable Meredith Straw" were forgeries.

The record shows that when the case was called for trial the defendant objected to going to trial and moved the court to strike the case from the assignment on the ground that his demurrer to the information had not been heard or passed upon.

It appears that the defendant's plea of not guilty had been entered on June 6th, that no permission of the court to withdraw said plea had been asked or secured, but counsel for the defendant, without leave of the court, had on June 17th, the day before the case was called for trial, filed a general demurrer to the information.

Thereupon the court announced, "if you want to present your demurrer I will hear it now." After hearing the argument, the court overruled said demurrer and the motion to strike.

The first assignment is:

"Error of the court in requiring this defendant to be tried on an information charging first degree forgery, on evidence presented making out a case of second degree forgery, and thereby sustaining a conviction of second degree forgery."

The statute upon which the conviction is based (Penal Code [St. 1931] § 2139 [21 Okla. St. Ann. § 1592]) defines the offense of forgery in the second degree as follows:

"Every person who, with intent to defraud, utters or publishes as true any forged, altered or counterfeited instrument or any counterfeit gold or silver coin, the forg-

ing, altering or counterfeiting of which is hereinbefore declared to be punishable, knowing such instrument or coin to be forged, altered or counterfeited, is guilty of forgery in the second degree."

Counsel in his brief calls the court's attention to the information designating the crime charged as forgery in the first degree, also calls the attention of the court to the instructions given by the court submitting only the issue of second degree forgery, and contends that this action of the court constituted prejudicial error.

It appears that the name given to the crime charged in the information is forgery in the first degree, but by the charging part the defendants are charged with forgery in the second degree.

A mistake in this particular is an irregularity and is not fatal. The introductory paragraph of an information is ordinarily equivalent to a mere descriptive label. Vickers v. U. S., 1 Okla. Cr. 452, 459, 98 Pac. 467.

A wrong name given to a crime in the preliminary part of an information is an irregularity only, and is not fatal. The charging part of the information must be looked to, to determine the character of the offense. Kelly v. State, 12 Okla. Cr. 208, 153 Pac. 1094.

Upon the record before us this contention is wholly without merit. It appears from the record that there were no objections made or exceptions reserved to any of the instructions given by the court, and it appears that the instruction on second degree forgery was given at the express request of the defendant.

It is further contended that the evidence is not sufficient to support the verdict, and that the court erred in refusing to direct a verdict of acquittal.

On the part of the state the evidence established the following facts:

That on the date alleged John B. Straw and Mabel Meredith Straw, husband and wife, were joint owners of the lots described in the information; that they had executed an oil and gas mining lease to Anderson-Prichard Oil Company, filed for record with the county clerk on March 17, 1936.

John B. Straw testified that he did not sign or acknowledge or deliver the mineral deed set forth in the information; that a broker, S. J. Sharber, told him that a mineral deed to said lots had been offered for sale at his office and wanted to know if such deed was genuine; if so, he was going to buy it; that this was the first knowledge he had of the mineral deed; that he went to the county clerk's office the next day and found said deed had been filed for record; that at that time he did not know the defendant H. R. Bruning, or his codefendant, Albert Zirm.

The original instrument or deed was offered in evidence.

Mabel Meredith Straw testified that she did not sign this deed and that her name was signed without her authority, knowledge, or consent; that she spells and signs her first name "M-a-b-el," the signature on the deed is spelled "M-a-b-l-e."

Kyle Johnson testified that he had lived in Oklahoma City about ten years, was unmarried, and made his home with his brother-in-law, Ed. Blaylock. That he had known the defendant Bruning for about a year before the time of the transaction involved. That around the 10th of April he met Bruning in a pool hall on South Hudson.

6

Bruning said he wanted him to run some errands for him,
and they walked from there down to the front of the
Kress Store. There Bruning pointed to a woman in
the store, said her name was Miss Bell, gave him an en-
velope, and told him to give it to her. That he went in
and gave her the envelope. She said she would be back
there at 1:30. That he went out and told Bruning what
she said. That at 1:30 he was back at the Kress Store,
and Miss Bell gave him the envelope which he delivered
to Bruning, who was waiting around the corner on Harvey
street. That a similar transaction occurred the next day.
Bruning waited on Harvey street while he delivered an
envelope to Miss Bell, and again a little after 1 o'clock
he received such envelope from her and delivered it to
Bruning. That Bruning told him, "There was some heir
stuff, and there was some people dealing he did not want
to see him." Then they started out to Capitol Hill. Brun-
ing first drove to the post office, stopping at Third and
Harvey. Bruning said he wanted to get these papers
fixed up and walked over to the post office. Coming
back, he handed him the papers to give to a man he pointed
out on the steps at the west entrance of the post office,
and said the man's name was Albert Zirm. That he
walked over to the man and said Mr. Bruning told him
to have him notarize these papers. Zirm took the papers
to a desk in the post office and, after signing the paper
and affixing his seal to it, gave it back to him, and he
went back to the car and gave the papers to Bruning.
They then drove out to Forty-Fourth and Shields, Capitol
Hill. Miss Bell was sitting in a car parked in front of
the Yarbor Pharmacy. Bruning went over and talked
to her 10 or 15 minutes; then came back to his car, opened
the door on the dash pocket and took out some papers,
handed them to him and told him to take them over to

Miss Bell. That he recognized the deed as the one Albert Zirm acknowledged in the post office a little while before that. That when he gave her the papers she said Mr. Bruning would know where to meet her. Bruning then drove back and stopped on Reno street. Bruning told him to go up to the Kress Store and wait for Miss Bell. That he went there and, after waiting about an hour, Miss Bell came by and went in the store. Bruning came by and told him to wait, then went in where Miss Bell was. Upon coming out, he told him to go back to the car, parked on California street. After waiting there about 40 minutes, Bruning came to the car and said they were having trouble in getting this transaction fixed up; said he had some more papers he wanted him to help with, and they drove up to Twenty-Third and Walker. Bruning left the car and was gone about 15 minutes. He then drove back to Thirteenth and Robinson and they went into a cafe. Brunning ordered beer, and used the telephone there. They then drove down to the Key building. Bruning left the car, walked in, came back, and handed him some papers and said, "The old gentleman that notarized them that morning would be in the lobby." That he took the papers which were folded up, went into the lobby, there met Albert Zirm and handed him the papers to notarize. Zirm said he was out of ink. They then went up to the fourth or fifth floor in the Key building. There Zirm notarized two instruments and gave them back to him. He went down on the elevator, returned to the car, and gave the papers to Bruning. It was then about 4:30 p. m. Bruning drove down to Main, there got out. He drove the car down to California street. After waiting there about 30 minutes, Bruning came to the car, then drove by and left him at his home. That he never told anybody his name was John B. Straw or

that he was the husband of Mabel Meredith Straw. That Bruning knew his name and always addressed him as Johnson. That he did not know the mineral deed that Bruning gave him to take to Albert Zirm to be notarized was a forgery. That no one had ever suggested to him that it was a forgery.

D. B. Ellis testified that he was in the real estate, insurance, and oil brokerage business in Oklahoma City. That he attempted to buy some royalty to be conveyed by mineral deed, covering lots 11 to 14, inclusive, block 1, Hare's Lincoln Boulevard addition to Oklahoma City, consideration $3,400, and received a mineral deed, signed John B. Straw and Mable Meredith Straw, and filed the same with the county clerk for record. That on Saturday, April 25th, he was called to Mr. Dutton's office, First National Bank building. Harrison White and Miss Bell from Norman were there. They had a deed signed John B. Straw and Mable Meredith Straw, made to H. R. White. James B. Rogers was there with him. That they were buying it together. Miss Bell seemed to do most of the talking, and said it would take $200 commission to consummate the deal. They told them they would take it. The agreed consideration was $3,400. He made out a check to John B. Straw for $3,200, and one for $200, to be cashed upon the presentation at the bank with the proper mineral deed. The banks were closed at that time and it was agreed to meet at Mr. Dutton's office the next morning. That with Mr. Rogers he was there the next morning. They didn't appear and they went on to his office. At 12 o'clock Miss Bell came in and she had a new deed made direct to him. She explained that she had been all morning trying to get that deed taken care of and insisted on having the consideration in cash. She explained that Mr. Straw had a wreck hauling a car of

whisky, and was on the scout from the law, and that he would not put in his personal appearance. That he would not take a bank draft or anything but the cash. That just before 2 o'clock they went over to the First National Bank and he cashed the $3,200 check and Mr. Rogers cashed the $200 check and gave Miss Bell the $3,200 and she gave him the deed and a receipt for the money, with the understanding that they go with her to Mr. Straw, and then go with Mr. Straw to either Judge Stewart or Mr. Hare, from whom the Shaws had purchased the property, and have them identify Mr. and Mrs. Shaw. That the money was not to be turned to anybody until they were identified to his entire satisfaction. They then went with her to the southeast corner of Main and Robinson, and she pointed out a party standing in front of the Kress Store and said: "Now, there is John B. Straw, don't say anything, let us go right on by and go in the store and he will follow us in." So they went in the store, but the man didn't follow. The defendant Bruning was standing there in front of the store and Miss Bell talked to Bruning, showed him receipts, and then handed them to him. He handed them back to her and she came back to us and said Mr. Straw when he saw Mr. Rogers thought he was an officer and would not come in to the store. Bruning walked away, and with Mr. Rogers, Miss Bell, he started back to his office. About halfway from Kress' to the corner of Main and Harvey Miss Bell turned around, handed him the bag with the money in it, and said, "I will see you in a few minutes," and turned back holding the receipts in her hand. They went on to his office. In about 15 minutes she came in and said, "Well, Mr. Ellis, Mr. Straw won't see you, he won't meet you or anybody else, he is scared to death and won't see anybody, I gave him those receipts and he is going to get

them signed both by himself and Mrs. Straw and get them notarized, I am to meet him there in an hour and get those receipts." Then he told her that would not satisfy him, that they had to have those parties identified as being the parties Mr. Hare and Judge Stewart sold those lots to. That they must be so identified. She said, "Well, give me the deed then," and he said, "All right." She went out and came back with the receipts, but did not turn them over to him. The receipts had been signed and notarized in the same handwriting that the deed had been signed. That he made the deal in good faith.

The testimony of James B. Rogers as to the facts concerning the transaction was the same in substance as that of the witness Ellis.

W. E. Freeman testified that he was acquainted with the defendant Bruning for the past 12 years. That he came to his home about April 4, 1936, and asked him how he would trade his farm near Claremore for some royalty out north of the Capitol. That he had a man that might trade this royalty for his farm. Bruning came back that evening and said the man would trade for $1,100 to boot. He told Bruning he would make the deal and give $1,100 to boot, and pay his commission. That the description he gave of the property was lots 11, 12, 13, and 14, Block 1, Hare's Lincoln Boulevard addition. That they looked at the lots and he agreed with Mr. Bruning to trade for this royalty. Bruning said he would arrange for him to meet the owner the next morning. At that time he met Bruning in front of the Ramsey Tower building. Bruning said the owner of the royalty was hauling whisky and had a car wreck and the officers were looking for him. Then they went up to Judge Renegar's office, a girl there drew up a contract, and it was acknowledged before a

notary there. Bruning signed the contract as the agent, and said he would get the owner of the land to make the deal.

J. H. White testified that he was a dealer in real estate and oil leases. That about the middle of April Mrs. Bess Dougal told him the mineral rights on the lots in question were for sale by Miss Bell. That he talked to Miss Bell about it, and told her he had a man that agreed to pay $4,000 for the mineral rights for the four lots. That he asked Miss Bell for something to show to buyers that he had the right to deliver the deed. Miss Bell said she would have his name put in the deed by the owner. That she came back that day with his name in the deed. That he only had possession of it when Miss Bell was present, just to show that it could be transferred, then she would take it back. That he was present when Mr. Ellis and Mr. Rogers tried to make the deal. It was offered to Mr. Ellis for $3,200 and the commission, and he agreed to make a deed to D. B. Ellis. They then discussed another deed. That he was in Mr. Ellis' office on Monday when the trade was made. Miss Bell left there to see the owner about the deed to the property. That the money for the deed was counted in his presence. The $200 check was cashed and handed to him by Mr. Rogers. That he gave Miss Bell $50, Mr. Crabtree $50, and kept $50 himself, and $50 for Mrs. Dougal.

When the state closed its testimony, the defendant demurred to the evidence and moved the court to direct a verdict of not guilty, "on the ground that the state had wholly failed to make out any case against the defendant," which was overruled. Exception reserved.

As a witness in his own behalf, the defendant testified that for the last few years he had been handling real

estate transactions. That he heard the testimony of the witness Kyle Johnson, but never knew his name until the preliminary hearing in this case. That Johnson told him his name was Straw. That the first deal he had with him was on some property at Seventeenth and Linwood. Later Johnson told him about trading this royalty for a farm. That he knew Mr. Freeman had a farm and he talked to him. Freeman wanted two thousand to boot, then agreed on eleven hundred. Mr. Freeman signed a contract to trade the farm for the royalty and pay back $1,100, also agreed to pay him $150 commission to make the deal. The contract was offered and received in evidence. That he saw Johnson quite often after that. That coming out of the Kress Store he met Mr. Ellis, Mr. Rogers, and Miss Bell, but did not know Mr. Ellis or Mr. Rogers at that time, had a conversation there with Miss Bell, about selling some royalty in Cleveland county and about lots 5 and 6, block 15, Gast Heights, that she wanted him to handle for her. That the first time he ever saw the mineral deed admitted in evidence was at the preliminary trial. That he had nothing to do with the deed or papers concerning those lots, except his deal with Mr. Freeman.

On cross-examination he stated that he had known Kyle Johnson for a couple of years, but did not know his name. That after signing the Freeman contract, he talked with Mr. Straw on the 'phone, and told him he had talked to his father, who said he had leased his place and might sell the royalty and wanted to know if he would sell it. Mr. Straw said, "No," so he never called him any more. That he took Kyle Johnson home several times, but never did go out there and ask Mr. Blaylock if a man by the name of Johnson lived there. There the only time he ever met Miss Bell was upon coming out

of the Kress Store; that he had known Albert Zirm for about 10 years. That he saw Mr. Zirm at the post office about the 23d of April. That Kyle Johnson was not with him that day. That he never had Mr. Zirm notarize the signature of John B. Straw and Mabel Meredith Straw to a deed.

Asked if he did not on April 10, 1936, take a mineral deed to the lots in question, signed John B. Straw and Mable Meredith Straw, to 214½ S. W. Washington street, where Albert Zirm lived, and had him acknowledge the said signatures, he answered: "No, sir." Asked if he did not tell Mr. Zirm that he knew the signatures of John B. Straw and Mabel Meredith Straw, and that was their signatures, answered: "I never took a deed to Mr. Zirm."

Albert Zirm, for the defendant, testified he had lived in Oklahoma county about 10 years, was a notary public, identified the acknowledgment to the mineral deed admitted in evidence. That Kyle Johnson came to him with this instrument at the steps of the post office and said, "I have another instrument for you to acknowledge." He had this instrument in his hand, he said, "Oh, John B. Straw, we will have to go to the post office and get some ink and write the acknowledgment." That they went into the post office. He said, "Mr. Straw, did you and your wife sign this?" He said "Yes." Upon that he acknowledged it. That he thought there was a deed acknowledged ahead of that. That a few minutes before he saw Mr. Bruning in the post office. That he had his seal in his pocket; that later this same boy came back with a couple of receipts and he met him in the lobby of the Key building and said, "Well, Mr. Straw, you have some more acknowledgments to take." He said, "Yes, I am in a hurry," and then went up in Fisher's office. He was then asked if upon April 10, 1936, he acknowledged a mineral deed,

signed by John B. Straw and Mable Meredith Straw, and answered, "Yes."

He further testified:

"Q. That was a mineral deed. Did John B. Straw and Mabel Meredith Straw on April 10th appear before you and execute or acknowledge their signatures on that deed? A. They did not. Q. Nobody appeared and acknowledged their signatures? A. Only my friend Mr. Bruning here brought them up. Q. He brought that mineral deed that was signed John B. Straw and Mable Meredith Straw of April 10th to you to acknowledge it? A. Mr. Bruning did. Q. Is that this defendant here? A. Yes, sir. Q. Was anybody with Mr. Bruning when he brought the mineral deed on April 10th to you? A. Not that I know of. There might have been and I didn't see them. Q. Who vouched for the signatures of these folks to you when you acknowledged that mineral deed of April 10th? A. Mr. Bruning said, 'I want you to fix up a little deal for these young people,' and he said mostly this deed will never be used. I said, 'Mr. Brüning, this is very irregular.' 'Well,' he said, 'You can take the acknowledgment and I will vouch to anything that is wrong.' So, I said, 'Well, under those circumstances I will take care of it.' Q. Did he tell you whether or not he knew John B. Straw and Mabel Meredith Straw? A. Well, he said, yes—They signed it all right."

In rebuttal Ed Blaylock testified he had lived in Oklahoma City about 11 years; that his brother-in-law, Kyle Johnson, lived with him; that about the middle of April this year, a man called at his home, 723 W. Seventh street, and asked him if Mr. Johnson lived there. He answered: "Yes." Invited him in and Kyle Johnson introduced him as Mr. Bruning. About 3 days later the doorbell rang. He went to the door. Mr. Bruning was there and asked if Mr. Johnson was at home. He said "Yes," and called Kyle, who was in the kitchen.

It is insisted that the testimony is insufficient to warrant a conviction, in that it does not connect the defendant with the uttering of the forged instrument.

It is a well-settled rule of law that, if there is competent evidence to support the conviction, this court will not weigh the sufficiency of the evidence.

The gist of the offense under the statute (section 2139, supra) is the uttering or publishing as true the false or forged instrument, knowing such instrument to be forged, coupled with the intent to defraud.

Section 1808, Penal Code (St. 1931), 21 Okla. St. Ann. § 172, provides:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

We have seldom seen a stronger case of circumstantial evidence. It shows a conspiracy to obtain property of Mr. and Mrs. Straw, joint owners of the lots. The first criminal act was the forgery of the mineral deed; then came the utterance of the false and forged instrument.

When a conspiracy is entered into to cheat and defraud any person of any property, all persons who engage therein are responsible for all that is done in pursuance thereof by any of the coconspirators until the object for which the conspiracy was entered into is fully accomplished. Grayson v. State, 12 Okla. Cr. 226, 154 P. 334.

A sufficient answer to the contention made is that in our opinion the evidence is not only sufficient to sustain the conviction, but is of such character as to leave no doubt as to the correctness of the verdict.

16

Finding no prejudicial error in the record, the judgment is therefore affirmed.

DAVENPORT, P. J., and BAREFOOT, J., concur.